**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BRYAN MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-887-SMY-SCW |
| | ) | |
| VILLAGE OF CAHOKIA, ILLINOIS, | ) | |
| a municipal corporation, VILLAGE OF | ) | |
| CAHOKIA WATER & SEWER, and | ) | |
| MAYOR GARY CORNWELL, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendants, Village of Cahokia ("Village") and Mayor Gary Cornwell (collectively "Defendants"), by their attorneys Jane M. May and Brian M. Funk, and for their Partial Motion for Summary Judgment and Supporting Memorandum of Law, state as follows:

### INTRODUCTION

On October 30, 2014, Plaintiff filed a two-count First Amended Complaint. (*Ex. A*). In Count I, Plaintiff alleges his employment was terminated because of his race. (*Am. Compl*. ¶10). In Count II, Plaintiff alleges he was fired because he ran for mayor in 2011. (*Am. Compl*. ¶8 – Count II). In Count III, Plaintiff alleges he is owed unpaid vacation and sick time pursuant to 820 ILCS 115/5. (*Am. Compl*. ¶¶8-10 – Count III). Defendants move for summary judgment as to Counts I and II, because there is no evidence in the record to support Plaintiff's claims.

### STANDARD FOR MOTION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).  In determining whether there is a genuine issue of fact, the court should view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  The mere existence of "some" alleged factual dispute will not defeat a motion for summary judgment; "the requirement is that there be no genuine issue of material fact."  *Id*. at 247-248.  Summary judgment is not "a disfavored procedural shortcut, but rather [it is] an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp v. Catrett*, 477 U.S. 317, 327 (1986).

## STATEMENT OF FACTS

Gary Cornwell is the Mayor of the Village of Cahokia ("Mayor").[1]  The Mayor was elected to office on April 5, 2011.  (*Ex. G*).  The Mayor received 1557 out of a possible 3300 votes. (*Ex. G*).  The Mayor succeeded former Mayor Frank Bergman.  (*Cornwell Aff*. ¶1).[2]  Rory Morgan ("Morgan") was the supervisor of the Water and Sewer Department ("Department") from February 4, 2013 until March of 2014.  (*Morgan Dep*. 6:3-11).[3]  Jim Wall ("Wall") was the foreman of the Department during the time Plaintiff was employed at the Village.  (*Moore Dep*. 17:12-19).[4]  Plaintiff was employed as an equipment operator in the Department from May 2, 1994 until January 28, 2014.  (*Moore Dep*. 10:25; 11:1-25; 12:1).[5]  Plaintiff is African-American.  (*Ex. FF*).  Plaintiff ran for Mayor in 2011 and received 28 out of a possible 3300 votes.  (*Ex. G*).  Plaintiff signed an oath when he was hired that he swore to obey the orders of his superiors.  (*Moore Dep*. 10:3-24; *Ex. H*).  Jeff Radford ("Radford"), who is Caucasian, is a

---

[1] The Mayor's deposition is attached hereto as *Exhibit A*.
[2] The Mayor's affidavit is attached hereto as *Exhibit JJ*.
[3] Morgan's deposition is attached hereto as *Exhibit C*.
[4] Wall's deposition is attached hereto as *Exhibit D*.
[5] Plaintiff's deposition is attached hereto as *Exhibit E*.

former employee of the Department.  (*Radford Dep*. 8:4-9; *Cornwell Aff*. ¶2).[6]  Radford ran for Mayor in 2011.  (*Ex. G*).  Radford was employed by the Village from May of 2000 through May 7, 2007 and was personally hired back to the Village by the Mayor in 2011.  (*Radford Dep*. 8:10-14; 9:4-14; 9:15-25).  Radford began working in the Department around December of 2011 although it could have been after that date.  (*Radford Dep*. 11:23-25; 12:1-7; 13:17-23).  Radford left the Village on July 19, 2013 to take a job with St. Clair County.  (*Radford Dep*. 15:10-17).  Radford normally worked with Plaintiff.  (*Radford Dep*. 16:23-25).  Plaintiff was senior to Radford and Plaintiff dictated where Radford went during the day.  (*Radford Dep*. 16:20-22; 21:15-22).  Radford testified the Mayor never said anything to him about politics while he worked in the Department.  (*Radford Dep*. 35:13-22).  Radford testified he was never disciplined.  (*Radford Dep*. 44:9-17).

On November 16, 2004, Plaintiff was given three days off without pay by Michelle Halter ("Halter"), his former supervisor, for leaving his "duty assignment" and "insubordination."  (*Moore Dep*. 18:21-25; 19:1-25; 20:6-25; *Ex. I*).  On November 29, 2004, Plaintiff was given three days off without pay again by Halter for being at a "non-authorized location."  (*Moore Dep*. 21:21-25; 22:1-25; *Ex. J*).  On January 10, 2011, Halter issued a verbal warning to Plaintiff regarding violation of Department policy.  (*Moore Dep*. 23:9-25; 24:1-25; 25:1-6; *Ex. K*).

In 2009, Department employee Ray Herderhorst ("Herderhorst") stepped down from his position as lead man.  (*Wall Dep*. 8:6-13).  Wall then recommended to Mayor Bergman that Plaintiff be made lead man.  (*Ex. L*).  On September 2, 2009, Wall wrote a letter to Mayor Bergman requesting that Plaintiff be made lead man because he was the next most senior employee and requesting that Plaintiff's salary be adjusted accordingly.  (*Wall Dep*. 9:1-8; *Ex.*

---

[6] Radford's deposition is attached hereto as *Exhibit F*.

*L*).   At the request of Plaintiff, Wall also stated in the letter that Plaintiff was an excellent operator and should be paid more than lead man.  (*Wall Dep*. 9:9-20; 10:20-24; *Ex. L*).  Wall testified he believed Plaintiff was a very good operator but not a good employee.  (*Wall Dep*. 57:12-21).  Mayor Bergman denied Wall's request to make Plaintiff lead man.  (*Wall Dep*. 11:3-12; *Cornwell Dep*. 12:1-5; 19:1-10; *Ex. L*).  Plaintiff, however, began receiving lead man pay on October 23, 2009.  (*Ex. M*).  Wall testified he treated Plaintiff and Herderhorst as lead men after September 2011.  (*Wall Dep*. 14:12-25; 15:1-2).  Morgan testified that to his knowledge Plaintiff was never made lead man.  (*Morgan Dep*. 8:11-16).  On September 1, 2011, the Mayor sent Plaintiff's union representative a letter stating that the Mayor could not find any documentation that Plaintiff had been made lead man and that he believed the union agreement required Herderhorst to serve as lead man based on seniority.  (*Cornwell Dep*. 10:4-24; 11:1-24; 12:1-24; 16:9-24; 17:1-6: 18:2-13; *Ex.'s N, P, Q*).  Section eight of the union agreement states that selection of the lead man will be based seniority.  (*Ex. O*, p. 5).

On October 4, 2012, Plaintiff was given three days without pay by the Mayor for leaving his job assignment and initiating a hostile argument with his foreman.  (*Ex.'s R, S*).  Plaintiff was disciplined, because Plaintiff was previously warned about "hostility and physical intimidation in the workplace."  (*Ex.'s R, S*).

On March 7, 2013, Plaintiff and Radford were assigned to do a "jet job" at Mackanson's Automotive by Wall.  (*Moore Dep*. 32:7-25; 35:8-15).  Plaintiff drove the truck that he and Radford were riding in.  (*Moore Dep*. 34:16; *Cornwell Dep*. 29:10-13).  Plaintiff and Radford left Mackanson's to get the "jet" truck.  (*Moore Dep*. 33:1-2).  Plaintiff saw a friend and co-worker, Wes Wofford ("Wofford"), and stopped the truck to talk to Wofford and introduce him to Radford.  (*Moore Dep*. 33:1-25, *Radford Dep*. 20:21-25; 21:1-14; *Morgan Dep*. 12:16-25;

14:5-19).  The Mayor and Morgan pulled up next to Plaintiff's vehicle and the Mayor asked what Plaintiff was doing at Wofford's house.  (*Moore Dep*. 33:16-25; 34:1-7).  The Mayor told Plaintiff he should be at Mackason's.  (*Moore Dep*. 34:1-24).  The Mayor had a conversation alone with Radford and told Radford he was not going to discipline him for leaving Mackanson's because he was not driving, because Plaintiff was senior to him in the Department and because Radford was new to the Department.  (*Radford Dep*. 28:9-25; 29:1-19; 46:17-25; 47:1-6).  On March 13, 2013, the Mayor sent Plaintiff a notice of a disciplinary hearing for leaving his job site and failing to obey the orders of his foreman related to the March 7, 2013 incident.  (*Ex. T*).  On April 16, 2013, Plaintiff was given five days off without pay as a result of leaving his job site on March 7, 2013.  (*Moore Dep*. 37:23-25; 38:1-13; *Ex. U*).

On April 16, 2013, Plaintiff was also told that he had improperly left work for a half day without getting permission from his supervisor, although Plaintiff was not disciplined for taking the half day without prior approval.  (*Moore Dep*. 37:23-25; 38:1-13; *Ex. U*).  Plaintiff testified that on April 16, 2013 he understood that employees were required to get approval for vacation days from their supervisor or the Mayor.  (*Moore Dep*. 39:1-20).  Plaintiff testified that after April 16, 2013, the vacation policy was not followed and that employees followed the past practice of getting permission from their foreman although Plaintiff could not provide any specific instances where employees requested time off from their foreman after April 16, 2013.  (*Moore Dep*. 41:7-25; 42:1-25; 43:1-3; 43:3-6; *Ex. X*).  Radford testified he believed employees requested vacation time through their foreman but he could not provide any specific instances where employees requested time off from their foreman after April 16, 2013.  (*Radford Dep*. 54:3-12; 64:17:22).  The Mayor testified the Village policy required employees to request vacation time from their supervisor or the Mayor.  (*Cornwell Dep*. 34:22-24; 35:1-5; 36:2-3, 23-

5

24; 37:1-20).  Village employee Phil McIntyre was terminated for failing to follow the vacation policy.  (*Cornwell Dep*. 41:2-4).  McIntyre is Caucasian.  (*Cornwell Dep*. 41:15-16).  Plaintiff could not recall asking for vacation time from his supervisor after April 16, 2013 and he never requested permission for vacation time from the Mayor.  (*Moore Dep*. 43:11-24).  In 2013, Plaintiff took off work on December 13, 16-20 and 23-24.  (*Ex. V*).  Plaintiff did not get approval from his supervisor or the Mayor.  (*Morgan Dep*. 63:6-20; *Ex. V*).  Morgan did not know where Plaintiff was on December 13, 16-20 and 23-24.  (*Morgan Dep*. 63:21-24).  The other employees in the Department were good about requesting vacation time from their supervisor.  (*Morgan Dep*. 39:15-21).  The vacation form states in all caps that the "Vacation/Personal/Sick Days Form" is to be turned in "BEFORE vacation and personal days are taken."  (*Ex. V*).  Herderhorst and Wall requested time off in December of 2013 and received permission from their supervisor before their vacation days.  (*Ex. W*).  The Mayor testified he was not aware of any other Department employees taking time off without getting prior approval from their supervisor or the Mayor.  (*Cornwell Dep*. 50:16-22)

On September 20, 2013, the Water and Sewer Department formally adopted a policy that required employees of the Department to fill out a "Daily Worksheet" that was to include specific details about their daily work.  (*Ex. Y*).  The worksheet policy stated that employees should not describe their work as being "Area Wide" (that portion of the worksheet policy is underlined for emphasis).  (*Ex. Y*).  The policy stated that worksheets are "a vital link within our department and the ever increasing demands of it from the E.P.A."  (*Ex. Y*).  Plaintiff knew communication with the EPA was important because the Village had a lot of sewer breaks.  (*Moore Dep*. 49:8-11).  Plaintiff understood that worksheets were important for litigation purposes.  (*Moore Dep*. 69:21-25; 70:1-4).  Plaintiff signed the policy acknowledging he read

6

and understood the importance of filling out worksheets.  (*Moore Dep*. 47:16-23; *Ex. Y*).
Plaintiff testified he "did not pay a lot of attention to the details of the memorandum."  (*Moore Dep*. 48:13-17).  After the policy was enacted, Plaintiff only filled out worksheets for September 30, October 1-4, October 7-11 and October 14-15.  (*Ex. Z*).  Plaintiff did not turn in worksheets for any other work day after September 20, 2013.  (*Ex. Z*).  Wall testified that none of the other Department employees failed to complete daily worksheets after the policy was adopted on September 20, 2013.  (*Wall Dep*. 59:2-9).  The Mayor did not view Plaintiff's worksheets but Morgan told the Mayor that Plaintiff had not filled out worksheets for an extended period of time.  (*Cornwell Dep*. 44:3-24; 45:1-11).

Wall testified that Plaintiff began to refuse to operate other equipment at times during 2013 and that none of the other employees refused to do work he assigned.  (*Wall Dep*. 50:25; 51:22-25; 57:9-11).  Morgan testified it was difficult to get Plaintiff to follow orders compared to other employees.  (*Morgan Dep*. 61:8-10).  Morgan testified Plaintiff would refuse to do the work he assigned,  and that he had problems getting Plaintiff to do the work he assigned on a daily basis.  (*Morgan Dep*. 32:2-8; 61:11-13).  Morgan testified that he and Mayor made the decision to recommend Plaintiff's employment be terminated.  (*Morgan Dep*. 32:2-8).

On January 7, 2014, the Mayor sent Plaintiff a letter informing Plaintiff that he failed to report to work on December 13, 2013, December 16-20, December 30-31 and January 2-3 and that Plaintiff had neglected or refused to complete and submit worksheets as had been specifically required since September 20, 2013.  (*Ex. AA*).  A pre-disciplinary hearing was set and Plaintiff was advised of his right to have his union representative and/or attorney present and to introduce any evidence or argument in opposition to the proposed discipline.  (*Ex. AA*).  A pre-

disciplinary hearing was held on January 23, 2014.[7]    At the pre-disciplinary hearing, Plaintiff admitted he failed to get authorization to take vacation time from Morgan or the Mayor.  (*Ex. BB*, p. 13).  Plaintiff acknowledged that he received a letter on April 16, 2013 that stated he needed to get authorization to take vacation time from Morgan or the Mayor.  (*Ex. BB*, pp. 19-20).  Plaintiff stated that he got authorization to take off work at Thanksgiving from Wall and that Wall then got permission from Morgan for Plaintiff's vacation.  (*Ex. BB*, pp. 21-23).  Plaintiff admitted he did not get authorization to take vacation in December of 2013 from his supervisor either directly or indirectly through Wall but that he assumed he had permission.  (*Ex. BB*, pp. 21-24).  Plaintiff admitted he neglected or refused to fill out worksheets and that he violated the worksheet policy.  (*Ex. BB*, p. 6).  Plaintiff's union representative admitted Plaintiff failed to follow the Village's policies.  (*Ex. BB*, p. 35).  Plaintiff understood the pre-disciplinary hearing was important, that he could be terminated, that it was important to provide any defense he had and that he had the opportunity to address all of the disciplinary issues at the hearing.  (*Moore Dep*. 62:4-19; 63:1-9).    Plaintiff did not raise the issue of racial or political discrimination at the hearing.  (*Ex. BB*).

   The Mayor recommended Plaintiff be terminated based on a progressive chain of discipline involving multiple incidents.  (*Cornwell Dep*. 57:10-24).  The Mayor testified the administration pleaded with Plaintiff to follow policy and that he was told Plaintiff would refuse orders on a daily basis.  (*Cornwell Dep*. 63:3-21).  Based on the pre-disciplinary hearing and the recommendation of the Mayor and Morgan the Village Board voted unanimously to terminate Plaintiff's employment on January 28, 2014.  (*Cornwell Dep*. 62:5-7; *Ex's. CC; II*).  Other African-Americans worked at the Village and those individuals were not disciplined or terminated while the Mayor has been in office.  (*Cornwell Dep*. 67:13-24; 68:1-6; *Ex. II*).  The

---

[7] A transcript of the pre-disciplinary is attached hereto as *Exhibit BB*.

union attorney issued an opinion letter regarding Plaintiff's termination and recommended, based on his 25 years of handling arbitration cases, that the union not take Plaintiff's grievance to arbitration because there was no dispute Plaintiff committed the charged offenses.  (*Ex. DD*). Plaintiff's union did not seek arbitration because it believed there was "no realistic likelihood of prevailing in arbitration."  (*Ex.'s DD, EE*).

While employed at the Village, Plaintiff never made a complaint about racial or political discrimination.  (*Moore Dep*. 79:19-22).  Plaintiff testified that the conduct of a racial in nature alleged in his Amended Complaint was based on his belief that he was subject to different sets of rules for 20 years and the Mayor "took those rules to the epitome by allowing other men to even due projects, grocery shopping, haircuts, even allowed one man to build a restaurant on – literally on the clock." (*Moore Dep*. 80:14-25; 81:1-3; 89:4-22).  Plaintiff was not terminated for doing projects, grocery shopping, getting a haircut, or working on a business.  (*Moore Dep*. 83:10-21).   The Mayor testified he was not aware of employees going to the grocery store, getting haircuts or working on a business during work hours.  (*Cornwell Dep*. 50:23-24; 51:1-14).  Morgan testified he was not aware of employees going to the bank, grocery shopping or doing things of that nature.  (*Morgan Dep*. 34:24-25; 35:1-7).  Radford testified the Mayor saw him at a gas station on his lunch break and that the Mayor investigated what Radford was doing there during the work day.  (*Radford Dep*. 32:3-25; 33:1-13).  Plaintiff testified that the discrimination alleged in his lawsuit is summarized in a handwritten document he produced during discovery.  (*Ex. FF*).  Plaintiff testified the discrimination he allegedly faced also occurred before the Mayor was elected but that he never made a complaint about differential treatment before or after the Mayor was elected.  (*Moore Dep*. 91:5-16; 92:20-22; 111:20-25; 112:1).  Plaintiff testified he never discussed the discrimination alleged in his Complaint with

Wall, Morgan, Mayor Bergman or the Mayor.  (*Moore Dep*. 92:1-25; 93:1-4).  Plaintiff testified

the discrimination based on political activity alleged in his Complaint was based, in part, on an

incident where Plaintiff was hosting a group that was taking pictures at a business that did not

have a business license and the Mayor sent a police officer to the building to "shut [the] event

down." (*Moore Dep*. 94:20-25; 95:1-25; 96:1-20; *Ex. GG*).  The Mayor testified that he was told

Plaintiff was opening up the business and bringing people inside and that it was not allowed

without a business license.  (*Cornwell Dep*. 52:1-24; 53:1-24; 54:1-7).  The Mayor testified that

he spoke with Plaintiff about the business license issue and Plaintiff did complain that he was

being treated unfairly.  (*Cornwell Dep*. 53:19-24; 54:1-15).  Plaintiff testified the discrimination

based on political activity alleged in his Amended Complaint was based, in part, on the fact the

Mayor demoted Plaintiff from his position as "lead man." (*Moore Dep*. 102:1-9; *Ex. GG*).

Plaintiff testified he believed it was possible that he was demoted from lead man because of his

political activity and race.  (*Moore Dep*. 100:1-25; 101:1-4).  In his interrogatories, Plaintiff

stated he was discriminated against because of the argument he got into with Wall on October 3,

2012.  (*Ex. GG*).  Plaintiff testified he believed the Mayor was biased towards him but was not

sure of the Mayor's motives.  (*Moore Dep*. 104:2-17).  Plaintiff testified it was his "opinion" the

Mayor fired him for racial and political reasons.  (*Moore Dep*. 101:10-19).  Plaintiff has not

applied for employment since he was terminated.  (*Moore Dep*. 112:9-16; *Ex. GG*, ¶9).

## ARGUMENT

**I.     PLAINTIFF'S RACIAL DISCRIMINATION CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS PRESENTED NO EVIDENCE THAT SHOWS HIS EMPLOYMENT AT THE VILLAGE WAS TERMINATED BECAUSE OF HIS RACE.**

A claim of race discrimination against an employer may be established in one of two

ways; under the direct method or the indirect burden-shifting method.  *Adams v. Wal-Mart*

*Stores, Inc.*, 324 F.3d 935, 938 (7th Cir. 2003).  Under the direct method, the plaintiff must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as his race.  *Id.* at 938-939.  Direct evidence essentially requires an admission by the decision-maker that his actions were based on prohibited animus.  *Koszola v. Board of Educaton of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004).  Circumstantial evidence of intentional discrimination may consist of "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff."  *Id.* at 939.  That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action.  *Id.*  Bigotry, *per se*, is not actionable.  *Id.*  There must be a real link between the bigotry and an adverse employment action.  *Id.*  Plaintiff can also demonstrate circumstantial evidence if he shows the existence of similarly situated comparators who did not experience a similar adverse employment action.  *Chaib v. Indiana*, 744 F.3d 974, 981-982 (7th Cir. 2014).

If the plaintiff cannot prevail under the direct method, the plaintiff must proceed under the indirect burden-shifting method set forth in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973).  Under that test, the plaintiff must first establish a *prima facie* case by demonstrating: 1) he was a member of a protected class; 2) he was meeting the defendants' business expectations; 3) that he was fired; and 4) he was replaced by someone outside the protected class.  *Hague v. Thompson Distribution Company*, 436 F.3d 816, 820 (7th Cir. 2006).  If the plaintiff succeeds in establishing a *prima facie* case, the defendant has a chance to articulate a legitimate, non-discriminatory reason for its action.  *Koszola*, 385 F.3d at 1110.  If the defendant shows such a reason, the plaintiff must offer evidence showing the reason is pre-textual.  *Id.*  A Plaintiff can

demonstrate the reason is pre-textual by again showing shows the existence of similarly situated comparators who did not experience a similar adverse employment action. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

### A. Plaintiff Cannot Prevail Under the Direct Method Because Plaintiff Has Produced No Direct Or Circumstantial Evidence That Shows Plaintiff's Employment With The Village Was Terminated Because of His Race.

Plaintiff cannot prevail under the direct method, because there is no direct evidence in the record that shows the Village or the Mayor terminated Plaintiff because of his race.[8] Plaintiff did not depose any of the Village Trustees, three of whom are African-American, and there is no evidence in the record that any of them made any admissions regarding the termination of Plaintiff's employment. (*Cornwell Aff.* ¶¶3-5). There is also no evidence in the record that the Mayor made any admissions and the Mayor specifically denies he has ever taken any adverse job action against any employee based on race. (*Cornwell Aff.* ¶6).

Plaintiff also cannot prevail under the direct method, because Plaintiff has produced no circumstantial evidence of racial discrimination. Absent from the record is any evidence of ambiguous statements, suspicious timing, discrimination against African-American employees or other pieces of evidence that would allow Plaintiff to create some "mosaic of discrimination." Plaintiff does attempt to offer some instances of racial discrimination, but none these incidents demonstrate racial discrimination on the part of Defendants, let alone discrimination that was linked to Defendants decision to terminate Plaintiff's employment. (*Ex.'s FF, GG,* ¶11).

For example, Plaintiff claims that his failure to get permission to take vacation time on December 13, 16-20 and 23-24 is evidence of racial discrimination. (*Ex. GG,* ¶11). In essence,

---

[8] To the extent Plaintiff brings claims against the Mayor, those claims should be dismissed. *See Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) (holding a supervisor does not, in his individual capacity, fall within Title VII's definition of an employer).

Plaintiff argues he requested vacation days in December the way he always requested time off and that it was the same procedure other employees were using during this time. (*Ex. BB*). There is no evidence in the record, however, that any other employees in the Department failed to follow the procedure of requesting vacation time from Morgan or the Mayor. In fact, the vacation forms for other employees produced by the Village demonstrate just the opposite. (*Ex. W*). In addition, Plaintiff specifically testified that he was unaware of other employees violating the vacation policy, and both he and his union representatives admitted in the pre-disciplinary hearing that Plaintiff failed to comply with the vacation policy. (*Ex. BB*, p. 35; *Moore Dep*. 41:7-25; 42:1-25; 43:1-3; 43:3-6). Plaintiff's problem is further compounded by the fact Plaintiff admitted he was aware of the vacation policy, understood the vacation policy and was previously warned that he needed to comply with the policy. (*Ex. BB*).

Plaintiff also claims he was discriminated against when the Mayor made Herderhorst lead man of the Department in 2011. Plaintiff, however, has produced no evidence that demonstrates race played any role whatsoever in the Mayor's decision. The Mayor testified he believed Mayor Bergman specifically denied Wall's request to designate Plaintiff as lead man and that the Village's agreement with Plaintiff's union specifically required that Herderhorst be designated lead man based on seniority. (*Cornwell Dep*. 10:4-24; 11:1-24; 12:1-24; 16:9-24; 17:1-6: 18:2-13; *Ex.'s N, P, O, Q*). The Mayor further testified that he believed Herderhorst was, by default, the lead man under the agreement. (*Cornwell Dep*. 13:22-24; 13:1-2). While Plaintiff's union did send the Mayor a letter regarding the lead man issue, neither Plaintiff nor Plaintiff's union ever filed a formal grievance, alleged racial discrimination or argued the agreement was misinterpreted or misapplied. (*Ex. P*). In addition, even if we assumed, *arguendo*, that this incident was racially motivated, there is no link between it and Plaintiff's termination.

If we view Plaintiff's claims of racial discrimination in a vacuum, they amount to nothing more than pure speculation, if anything.   However, when viewed in conjunction with the undisputed evidence in this case, it is clear Plaintiff's claims are totally unfounded.   While Plaintiff generally claims he was discriminated against for 20 years, there is no evidence Plaintiff ever complained to the Village or his union about the alleged discrimination.  (*Ex. FF*).   None of the witnesses in this case have testified that Plaintiff was discriminated against based on his race, including  Radford,  who  was  Plaintiff's  friend  and  closest  co-worker.    Most  importantly, however, is that Plaintiff admitted he did not know whether the Mayor's actions were racially motivated.  (*Moore Dep*. 104:2-17).   Therefore, Defendants' Motion for Summary Judgment should be granted.

### B. Plaintiff Cannot Prevail Under the Direct Method Because Plaintiff Has Produced No Evidence That Shows The Existence of Similarly Situated Comparators Who Did Not Experience A Similar Adverse Employment Action.

The similarly-situated inquiry is flexible, common-sense, and factual.  *Coleman*, 667 F.3d at 841.  It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?"  *Id*.  There must be sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together  with  the  other  *prima facie*  evidence,  would  allow  a  jury  to  reach  an  inference  of discrimination.  *Id*.  In other words, the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision.  *Id*.

In the case at bar, Plaintiff may attempt to argue that Radford was a comparator and that the Mayor's decision not to discipline Radford for the Mackason's incident qualifies as circumstantial evidence of racial discrimination.  Such an argument would be flawed for two

reasons.  First, the incident at Mackason's was not the reason why Plaintiff's employment was terminated.  (*Ex. BB*).  Second, Plaintiff and Radford were not similarly situated.  On the day of the Mackanson's incident, Plaintiff was Radford's "boss."  (*Radford Dep*. 21:15-22).  Plaintiff dictated how he and Radford would complete jobs and where they would go during the day and Plaintiff, who was driving the truck on the day of the incident, made the decision to stop at Wofford's house.  (*Radford Dep*. 21:15-22, 29:17-22, 65:22-24; *Moore Dep*. 32:7-25, 33:1-25, 34:1-25, 35:1-7).  There is nothing about Plaintiff and Radford that shows they were similarly situated except for the fact they both worked in the Department.  Even if we assumed, *arguendo*, that the two were similarly situated, there is no other evidence of racial discrimination in the record that would allow a jury to infer Plaintiff was fired based on that incident or because of his race.  Therefore, Defendants' Motion for Summary Judgment should be granted.

### C.  Plaintiff Cannot Prevail Under the Indirect Method Because The Evidence Does Not Show Plaintiff Was Meeting The Village's Expectations.

Because Plaintiff cannot prevail under the direct method, he must proceed under the *McDonnell Douglas* indirect burden-shifting method.  While Plaintiff meets the first and third factors of the indirect method analysis, he cannot show he was meeting Defendants' business expectations at the time he was let go.  As to that factor, the evidence clearly shows Plaintiff was not meeting business expectations.  Generally, Plaintiff refused to operate equipment, questioned his foreman's instructions on a daily basis, did not pay attention in daily meetings, routinely left job sites, and was verbally abusive and physically threatening.  (*Wall Dep*. 16:2-22; 23:15-25; 24:1-19, 45:24-25; 46:1-25; 47:1-7; 47:1-16, 50:25, 51:22-25, 56:1-25, *Morgan Dep*. 21:20-25; 22:1-11, 24:8-11, 61:1-25; *Ex. HH*).  Plaintiff also specifically admitted that he failed to follow the Department's daily worksheet policy despite knowing the Village considered the policy extremely important.  (*Ex.'s Z, BB*).  Plaintiff also specifically admitted that he failed to follow

the vacation policy despite understanding the policy and acknowledging he had been previously warned.  (*Ex.'s V, BB*).  Because Plaintiff cannot show he was meeting Defendants' business expectations, Plaintiff cannot proceed under the *McDonnell Douglas* indirect burden-shifting method.  Therefore, Defendants' Motion for Summary Judgment should be granted.

> **D.  Even If Plaintiff Could Establish A *Prima Facie* Case Under the Indirect Method The Evidence Shows Plaintiff's Employment With The Village Was Terminated Based On a Non-Discriminatory Reason That Was Not Pre-Textual.**

Assuming, *arguendo*, that Plaintiff could meet all of the factors of the *McDonnell Douglas* indirect burden-shifting method, the Village would be able to easily articulate a legitimate, non-discriminatory reason for its actions; namely Plaintiff's failure to follow Village policies and there is no evidence in the record that Defendants' non-discriminatory reason was pre-textual in nature.  Therefore, Defendants' Motion for Summary Judgment should be granted.

**II.  PLAINTIFF'S FIRST AMENDMENT CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS PRESENTED NO EVIDENCE THAT HIS EMPLOYMENT AT THE VILLAGE WAS TERMINATED BECAUSE OF HIS POLITICAL ACTIVITY.**

To make out a *prima facie* case of First Amendment retaliation, a public employee must present evidence that:   1) his speech was constitutionally protected; 2) he has suffered a deprivation likely to deter free speech; and 3) his speech was at least a motivating factor in the employer's decision.  *Spiegla v. Hull*, 371 F.3d 928, 935, 940-941 (7th Cir. 2004).  The third factor amounts to a causation inquiry.  *Roger Whitmore's Auto Service, Inc. v. Lake County*, 424 F.3d 659, 669-670 (7th Cir. 2005).  To establish a causal link between the protected expression and a subsequent action by the employer, the plaintiff must show that the protected conduct was a substantial or motivating factor in the employer's decision.  *Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 (1977).  A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.  *Spiegla*, 371 F.3d at

16

942.   A plaintiff can use circumstantial proof such as the timing of events or the disparate treatment of similar individuals to establish retaliatory motive.  *Culver v. Gorman & Co.*, 416 F.3d 540, 545-546 (7th Cir. 2005).

If the plaintiff makes this threshold showing, the burden then shifts to the defendant to produce evidence that they would have fired the plaintiff even in the absence of their constitutionally protected activity.  *Spiegla*, 371 F.3d at 943.  In other words, the defendant may show that retaliation was not the but-for cause for the firing.  *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).  If the defendant carries its burden, the plaintiff must then persuade a fact-finder that the defendant's proffered reasons were pre-textual and that retaliatory animus was the real reason that defendants fired plaintiff.  *Id.*  In the summary judgment context, this means that, to rebut the defendant's proffered explanations for plaintiff's termination, plaintiff must produce evidence upon which a rational finder of fact could infer that these explanations were lies.  *Id.*

### A.  Plaintiff Has Failed To Establish A Retaliatory Motive For His Termination.

In the case at bar, there is no evidence that Plaintiff's 2011 mayoral campaign, where he received less than 1% of the vote, had anything to do with Defendants' decision to terminate Plaintiff's employment.  (*Ex. G*).  What the evidence does show is that Plaintiff worked at the Village for almost three years after the Mayor was elected and that he was only fired after repeatedly violating Village policy and not living up to Defendants' business expectations.  (*Wall Dep.* 16:2-22; 23:15-25; 24:1-19, 45:24-25; 46:1-25; 47:1-7; 47:1-16, 50:25, 51:22-25, 56:1-25, *Morgan Dep.* 21:20-25; 22:1-11, 24:8-11, 61:1-25; *Ex.'s H, BB, CC, HH*).  In his response brief, Plaintiff may argue that Radford also claimed discrimination based on the fact he ran for mayor in 2011.  However, Radford's testimony on this issue amounts to nothing more than opinion and

speculation which is discredited by the fact the Mayor personally hired Radford after the 2011 election.  (*Radford Dep*. 9:15-25).

### B. Even If Plaintiff Establishes A Retaliatory Motive Defendants Can Show Retaliation Was Not the But-For Cause Of Plaintiff's Termination.

Assuming again, *arguendo*, that Plaintiff could establish a causal link between his political activity and Defendants' decision to let him go, the evidence clearly shows retaliation was not the but-for cause of Plaintiff's termination.   The evidence in the record clearly establishes Defendants had legitimate reasons for terminating Plaintiff's employment.  (*Wall Dep*. 16:2-22; 23:15-25; 24:1-19, 45:24-25; 46:1-25; 47:1-7; 47:1-16, 50:25, 51:22-25, 56:1-25, *Morgan Dep*. 21:20-25; 22:1-11, 24:8-11, 61:1-25; *Ex.'s HH, BB*).   The legitimacy of Defendants reasons is emphasized by the fact Plaintiff and his union admitted Plaintiff violated Village policy and asked for a lengthy suspension instead of termination of employment.  (*Ex. BB*).

### C. There Is No Evidence In The Record That Shows The Reasons For Plaintiff's Termination Was A Lie.

As noted above, Plaintiff and his union admitted Defendants' reasons for terminating Plaintiff's employment were true.  (*Ex. BB*).  Consequently, Plaintiff would not be able to show the reasons for his termination were a lie.   Therefore, Defendants' Motion for Summary Judgment should be granted.

### III.   IF COUNT I AND COUNT II ARE NOT DISMISSED PLAINTIFF CANNOT RECOVER DAMAGES FOR LOST WAGES BECAUSE HE FAILED TO MITIGATE HIS DAMAGES.

Plaintiffs that are discharged have a duty exercise reasonable diligence in attempting to mitigate damages by finding comparable work.  *Smith v. Great American Restaurants, Inc*., 969 F.2d 430, 438 (7th Cir. 1992).  Failure to mitigate is an affirmative defense for which the

defendant bears the burden of proof. *Id.* To establish failure to mitigate, the defendant must prove: 1) plaintiff did not exercise reasonable diligence in seeking comparable employment; and 2) that comparable employment was actually available if plaintiff had exercised reasonable diligence. *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir. 1990).

In the case at bar, Plaintiff admitted he has not sought employment since leaving the Village on January 28, 2014. (*Moore Dep.* 112:9-16; *Ex. GG*). There is no doubt comparable employment opportunities were available to Plaintiff as a laborer at one of the many municipalities, counties or townships in the Metro East or at private businesses in the St. Louis Area. Since Plaintiff failed to make any effort to seek employment and since the Village has pleaded "failure to mitigate" as an affirmative defense, Plaintiff is precluded from seeking damages for lost wages if any of his claims survive summary judgment. Therefore, Defendants' Motion for Summary Judgment should be granted.

## IV.   COUNT II OF PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED AS IT APPLIES TO THE VILLAGE OF CAHOKIA.

A municipality cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Rather, a municipality only is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. To proceed against a municipality, a Plaintiff must allege at least one of the following: (1) that the City had an express municipal policy that, when enforced, causes a constitutional deprivation; (2) that the City had a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage within the force of law; or (3) that the plaintiff's constitutional injury was caused by a person with final policymaking authority. *McCormick v. City of Chicago*,

230 F.3d 319, 324 (7th Cir. 2000).

In the case at bar, Plaintiff does not bring a claim against the Village under *Monell*, nor does Plaintiff allege any facts to support such a claim.  (*Ex. A*).  As a result, Plaintiff's request for relief against the Village in Count II should be dismissed to the extent it is brought for any other purpose other than indemnification.   Therefore, Defendants' Motion for Summary Judgment should be granted.

## V.   PLAINTIFF'S CLAIMS AGAINST "VILLAGE OF CAHOKIA WATER & SEWER" SHOULD BE DISMISSED BECAUSE NO SUCH ENTITY EXISTS.

In his Amended Complaint, Plaintiff brings claims against the "Village of Cahokia Water & Sewer."  (*Ex. A*).  The Village of Cahokia's Water and Sewer Department, however, is not a local public entity and it is not capable of being sued.  *See Bloom v. Palos Heights Police Department*, 840 F.Supp.2d 1059, 1070 (N.D. Ill. 2012) (holding departments within municipalities are not capable of being sued).  Therefore, Defendants' Motion for Summary Judgment should be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be granted and Count I and Count II of Plaintiff's First Amended Complaint should be dismissed with prejudice.

<div style="margin-left:40%">

VILLAGE OF CAHOKIA,
MAYOR GARY CORNWELL

By:   *s/Brian M. Funk*
      Brian M. Funk, #6277501
      O'Halloran Kosoff Geitner & Cook, LLC
      650 Dundee Road, Suite 475
      Northbrook, Illinois 60062
      Phone: 847/291-0200
      Fax:     847/291-9230
      Email: bfunk@okgc.com

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BRYAN MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-887-SMY-SCW |
| | ) | |
| VILLAGE OF CAHOKIA, ILLINOIS, | ) | |
| a municipal corporation, VILLAGE OF | ) | |
| CAHOKIA WATER & SEWER, and | ) | |
| MAYOR GARY CORNWELL, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2015 I electronically filed ***Defendants Village of Cahokia and Mayor Gary Cornwell's Partial Motion for Summary Judgment and Supporting Memorandum of Law*** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following registered CM/ECF participant(s):

Blake G. Meinders
Sprague & Urban
bmeinders@spragueurban.com

By:  *s/Brian M. Funk*
Brian M. Funk, #6277501
O'Halloran Kosoff Geitner & Cook, LLC
650 Dundee Road, Suite 475
Northbrook, Illinois 60062
Phone: 847/291-0200
Fax:    847/291-9230
Email:  bfunk@okgc.com